AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Texas

Clerk, U.S. District Court
Southern District of Texas
FILED

DEC 29 2014

David J. Bradley, Clerk of Court

| | |
|---|---|
| United States of America<br>v.<br><br>Daniel MARVIN<br>William PARKER<br><br>*Defendant(s)* | )<br>)<br>) Case No. C-14-1388M<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __12/28/2014__ in the county of __Kenedy__ in the Southern District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C., 846 | Knowingly, intentionally and unlawfully conspired to posses with the intent to distribute a controlled substance in Schedule II of the Controlled Substance Act of 1970, to wit:.72 kilograms,of methamphetamine |

This criminal complaint is based on these facts:

See Attachment "A"

☑ Continued on the attached sheet.

*Complainant's signature*

James Pool, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Dec 29, 2014

*Judge's signature*

City and state: Corpus Christi, Texas

B/ Janice Ellington, US Magistrate Judge
*Printed name and title*

ATTACHMENT "A"

On December 28, 2014, at approximately 9:15 a.m., Border Patrol Agent Manuel Rocha was performing Immigration Inspection duties as the Primary Agent at the US Border Patrol Checkpoint near Sarita, Texas, when two subjects later identified as Daniel W. MARVIN and April Robin LAWTHORN entered the primary lane driving a black Chevrolet Colorado bearing IN LP TK213LXS. Approximately 5 minutes later a grey in color Toyota Camry bearing IN LP's 343GW entered the primary lane of inspection of its two occupants later identified as William PARKER and Chelsea JEAN. Assisting in the Primary Inspection lane was Border Patrol Agent Remberto Arteaga and his canine partner "Kyra-C". Canine "Kyra-C" was conducting a preprimary free air sniff of the vehicle during my Immigration Inspection.

When the vehicle came to a stop, BPA Rocha began to question both MARVIN and LAWTHORN as to their citizenship. MARVIN stated that he was a United States Citizen and simultaneously LAWTHORN answered by stating that they both were United States Citizens. BPA Rocha then asked MARVIN where he and LAWTHORN where coming from and he stated that they were coming from "Harlingen". BPA Rocha continued his line of questioning and focused first on MARVIN. BPA Rocha asked MARVIN who he and LAWTHORN were visiting in Harlingen and he stated they were visiting a friend. BPA Rocha asked them both where exactly in Harlingen did his friend reside, he stated in "Harlingen but did not know where". BPA Rocha then asked MARVIN if he remembered a street name or anything like that, he stated all he did was plug in the address in the Global Positioning System (GPS). BPA Rocha then responded by saying "so you don't remember the address you plugged in the GPS", at which time he looked at LAWTHOR with a puzzled look on his face. LAWTHORN then reiterated that she did not remember the address. BPA Rocha then asked MARVIN how long they had been in Harlingen and he stated "three days, I think". While questioning both subjects BPA Rocha asked them if he could get consent to look inside the truck to which MARVIN complied and opened the side door of the extended pickup truck. BPA Rocha immediately noticed that the vehicle was clean and that the two subjects did not have enough clothing to sustain them both for three days given that it was a long trip from Indiana. BPA Rocha then questioned LAWTHORN as to who the vehicle belonged to and she was not given the opportunity to respond because MARVIN interrupted and stated that it belonged to a friend. During of questioning BPA Rocha began to notice that both subjects began to get nervous and were second guessing their answers.

At that point, BPA Rocha made the decision to send the vehicle into secondary based on facts and circumstances that BPA Rocha had gathered during his line of questioning.

BPA Rocha asked MARVIN for consent to search the vehicle, to which he consented. At that point the vehicle was sent into the secondary lane of inspection.

A few cars back the grey Toyota Camry vehicle came to the primary lane of inspection. BPA Rocha noticed before the car approached his location that the car had Indiana plates, same as the vehicle that had just been sent to the secondary lane of inspection.

While BPA Rocha began his line of questioning of the driver, later identified as William PARKER, BPA Arteaga advised that his service issued canine had alerted to vehicle. BPA Rocha questioned PARKER as to his citizenship and well as that of his passenger later identified as Chelsea JEAN. They both stated that they were United States Citizens. BPA Rocha questioned PARKER as to where he was coming from and he stated, "Brownsville". The two occupants of this vehicle were extremely nervous. A few times BPA Rocha caught them glancing towards the secondary lane of inspection where the truck had been sent. BPA Rocha asked PARKER if he was travelling in tandem with any other vehicles, to which he stated "NO". BPA Rocha then referred the vehicle to the secondary lane of inspection for a closer look in order to pin point where the source of BPA Arteaga's service canine had specifically alerted.

Once in secondary Kyra-C alerted to a small safe in the black pickup that was locked. After questioning all subjects they all denied any type of accountability towards the safe. It was then determined to send the truck along with the black safe to be x-rayed.

After the black pick-up truck was sent over to the backscatter for an x-ray inspection of its contents to include the small safe. The X-Ray revealed that the safe had some anomalies within its content. It was enough probable cause to open the small safe utilizing the key on MARVIN's key chain. This resulted in agents recovering one bundle of crystal methamphetamine wrapped in black electrical tape. The weight of the bundle was .72 kilograms valued at $37,036.80. Also in the safe was a fully loaded Sig Saur 9mm pistol (Serial number M488112). The pistol had one magazine with 8 rounds and one round in the chamber. Also in the safe was $1300.00 in U.S. currency all in 100 bills. There were seven small plastic baggies consistent with the type used to sell narcotics. Also in the lock box was a small scale consistent with what is used to weigh narcotics.

Further inspection of the grey Toyota Camry revealed a Pringles canister that had been modified to store contraband. Also in the sedan was a backpack that contained one loaded syringe of liquid methamphetamine and a small plastic baggie with one gram of crystal methamphetamine. A wooden box used to store marijuana was also recovered that contained two grams of marijuana along with a smoking pipe. Also in the back pack was a glass smoking pipe consistent with what is used to smoke narcotics and a small scale consistent with what is used to weigh narcotics. There was also four empty syringes located in the backpack.

Once all subjects were read their Miranda Warnings it was revealed that all subjects traveled south from Indiana in the black Chevy Colorado pick-up truck. It was determined that they came down to pick up the grey Toyota Camry that was left at an unknown location in Harlingen. The two male subjects MARVIN and PARKER were going to get paid 500 dollars each to take the car back to Indiana to a lady by the name of Elizabeth (Beth). It was also learned that the black safe was originally in the trunk of the grey car but eventually was moved by MARVIN to the black truck for safe keeping. MARVIN advised to agents that he knew something illegal was going down but was unaware of what exactly. He also stated that he wanted the safe with him because he had a feeling that it might have some money and wanted it for himself if that was the case.

On 12-28-2014, SA Paul Stewart and Bryan Hager responded to the checkpoint to take custody of the evidence in this case.

PARKER was read his Miranda Warning in his preferred language of English and agreed to answer questions. PARKER stated that he traveled to Harlingen with MARVIN to pick up a vehicle and drive it back to Indiana. PARKER stated that he was going to get paid $300.00 to drive the vehicle. PARKER denied any knowledge of narcotics in either vehicle. Agents explained that it was not sound judgment to take off of work for four days, losing pay, being out of town for Christmas for a mere $300.00. PARKER then recanted and stated that when he arrived in Harlingen, MARVIN told him that they were going to be taking a "package" back to Indiana that was inside the Toyota. PARKER admitted that he knew the "package" contained narcotics, but did not know the quantity. PARKER also recanted and stated that he was going to be paid $500.00 for helping MARVIN. PARKER stated that Liz LNU was the person who initially drove the Toyota from Indiana and left it at the Harlingen airport. PARKER then stated that Liz LNU then flew back to Indianapolis. PARKER stated that he has knowledge of Liz LNU to distribute narcotics in Indiana.

MARVIN was read his Miranda Warning in his preferred language of English and agreed to answer questions. MARVIN stated that approximately a week prior to him arriving in Harlingen, he was approached by Liz LNU requesting that he pick up the Toyota in Harlingen, Texas. MARVIN further stated that he picked up Liz LNU at the Indianapolis airport after she dropped the vehicle off at the Harlingen airport. MARVIN stated that he was aware that the Toyota would have a black safe in the trunk that contained narcotics. Liz LNU provided MARVIN with the location of the vehicle and the parking slip. Liz LNU also provided MARVIN with a key to the black safe. MARVIN stated that he asked PARKER to help him and drive the Toyota back to Indiana. MARVIN stated that he told PARKER that they were going to be bringing narcotics back to Indiana that were left in the Toyota. MARVIN stated that after picking up the Toyota, they traveled to the La Quinta Inn located at 5051 North Expressway in Brownsville, Texas. MARVIN provided agents with a copy of the folio that was given to him at checkout. MARVIN stated that he then took custody of the black safe and opened it, observing the narcotics, currency, and pistol. MARVIN had a picture on his cellular phone of the currency and the gun that were in the safe. This photo was accessed pursuant to the written consent signed by MARVIN to access the phone. MARVIN stated that he maintained custody of the black safe as he did not want PARKER to have access to the safe. MARVIN stated that he was also going to be paid $500.00 and reimbursement of expenses.

Both subjects were transported to the Coastal Bend Detention Facility for overnight detention. LAWTHORN and JEAN were subsequently released at the checkpoint as they denied knowledge of the methamphetamine and were not implicated by PARKER or MARVIN.